UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK

3/28/2019 9:43 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

```
-----------------------------X
                             :
AYHAN TARTICI,               :
                             :   16-CV-5140 (ADS)(AKT)
            Plaintiff,       :
                             :   February 26, 2019
                             :
            V.               :   Central Islip, NY
                             :
SANT KARAM S, INC., et al.,  :
                             :
            Defendant.       :
-----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          NEIL GREENBERG, ESQ.



For the Defendant:          NO APPEARANCE


Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1              THE CLERK:  Calling civil case 16-5140,

2     Tartici v. Sant Karam S., Inc., et al.

3              Please state your appearance for the record.

4              MR. GREENBERG:  Good afternoon again, your

5     Honor.  For the plaintiff, Neil Greenberg, 4242 Merrick

6     Road, Massapequa, New York.

7              THE COURT:  Good afternoon.  Let me get

8     started and then I have a number of questions I need to

9     get resolved.

10             MR. GREENBERG:  Yes, your Honor.

11             THE COURT:  As you know, on a motion for

12    entry of a default judgment, the first obligation the

13    Court has is to insure that the claims that are made as

14    stated actually satisfy all the elements legally for

15    that particular cause of action, so that's what I'm

16    going to address first, all right?

17             In this case, the plaintiff initially

18    commenced this wage-and-hour action on September 15th of

19    2016 against Sant Karam, Atlantis Management Group II,

20    LLC, Harjit Singh, and Billy Ming, for violations of

21    the Fair Labor Standards Act and the New York Labor

22    Law, including the failure to pay overtime wages and

23    failure to provide wage notices and statements.  I just

24    want to point out here at the beginning that it's my

25    intention that the transcript of this proceeding, which

1   you'll take care of, is going to serve as the report

2   and recommendation here to the district judge, who in

3   this case is Judge Spatt.

4           After the initial defendants failed to

5   timely answer or otherwise respond to the complaint,

6   the plaintiff requested a certificate of default, which

7   the Clerk of the Court entered on February 14th of 2017.

8   That's found in the docket at DE-14 and 15.  The

9   plaintiff filed an amended complaint, which is the

10  operative pleading in this case, on March 27th, 2017,

11  removing Billy Ming as a named defendant and adding as

12  named defendants the following principals of Sand

13  Karam:  Surinder Singh, Sukhwinder Singh, and Kulbir

14  Singh.  That's in the amended complaint, which is at

15  DE-22.

16          Plaintiff seeks first of all declaratory

17  relief that the defendants wilfully violated the

18  overtime provisions of the Fair Labor Standards Act and

19  the New York Labor Law, and the wage notice and wage

20  statements requirements of the New York Labor Law.

21          Number 2:  Have awarded compensatory damages

22  including all overtime compensation owed.

23          Number 3:  An award of interest on all New

24  York Labor Law overtime compensation and other

25  compensation, accruing for the date such amounts were

1   due.

2          And 4:  Have awarded all costs and

3   attorneys' fees incurred in prosecuting this action, as

4   well as liquidated damages.

5          The defendants failed to timely answer or

6   otherwise respond to the amended complaint and on

7   February 19th, 2018, the plaintiff requested entry of a

8   certificate of default.  I note that prior to

9   requesting the certificate of default against the

10  defendants, the plaintiff submitted four court approval

11  the proposed settlement with Atlantis, which Judge

12  Spatt approved, and Atlantis was dismissed from this

13  action.  That's found in DE-38, 39, 44, and 45.  45 is

14  the order dismissing Atlantis ultimately from the case.

15         The Clerk of the Court entered the

16  certificate of default against the other defendants on

17  February 26th, 2019.  That's found at DE-42.

18  Thereafter, the plaintiff submitted the instant motion

19  for default judgment, which Judge Spatt referred to

20  this Court for a report and recommendation.  That's an

21  order from March 27th, 2018.  The referral order is

22  found at DE-47.

23         As to the facts alleged here, the plaintiff

24  is a resident of Ronkonkoma, New York.  Sant Karam is a

25  domestic corporation organized and existing under the

1  laws of the State of New York.  Harjit, Surinder,

2  Sukhwinder, and Kulbir are all individuals -- they're

3  all Singh's, all residing in the State of New York.

4  The plaintiff was employed by the defendants between

5  2012 and July 12 of 2015 at the defendants' B.P. gas

6  station located at 2840 Pond Road, Ronkonkoma, New

7  York.  At all relevant times, Sant Karam was an

8  "enterprise" engaged in commerce or in the production

9  of goods for commerce, with a gross annual volume of

10  sales of not less than $500,000 for the years 2013,

11  '14, and '15.  These are all allegations in the

12  complaint, which because this is a default proceeding,

13  the Court is required to accept as true, which is what

14  I'm doing.

15          At all relevant times, Harjit, Surinder,

16  Sukhwinder, and Kulbir were corporate officers of Sant

17  Karam, who exercised operational and significant

18  business function, controlled and devised, directed,

19  implemented, and supervised employee wage-and-hour

20  practices and policies.  That's from the amended

21  complaint paragraphs 12 to 15.  The plaintiff also

22  alleges that each defendant supervised the plaintiff,

23  managed the day-to-day operations of the B.P. gas

24  station at which the plaintiff worked, and participated

25  in all relevant decisions related to plaintiff's

1  employment, including among other things the decision

2  to hire, plaintiff's work schedule, and the plaintiff's

3  pay.

4          Plaintiff alleges that during the course of

5  his employment, he regularly worked seven days per

6  week, for a total of 65 hours.  That's in paragraphs 27

7  and 28 of the amended complaint.  Specifically, the

8  plaintiff alleges that he worked Monday through Friday

9  from 4:00 p.m. to 11:00 p.m. and Saturday from 10:00

10 a.m. until Sunday 4:00 p.m.  Plaintiff alleges he was

11 always paid straight time in cash, at a regular rate of

12 $10 per hour.  That's in paragraphs 32 to 34 of the

13 complaint.

14         The plaintiff further alleges that he was

15 never paid any overtime compensation or time and one-

16 half his regular rate of pay when he worked more than

17 40 hours per week, that he was never given

18 uninterrupted meal breaks, and that he was never

19 provided with wage statements or notices.  That's in

20 paragraphs 31 to 36 of the amended complaint.  The

21 plaintiff also alleges that the defendants acted

22 wilfully and knew that their conduct violated the Fair

23 Labor Standards Act or showed reckless disregard for

24 the matter of whether their conduct violated the FLSA.

25         The legal standard here:  When a party

1  against whom a judgment for affirmative relief is

2  sought has failed to plead or otherwise defend, and

3  that failure is shown by affidavit or otherwise, the

4  clerk must enter the party's default.  That's from

5  Federal Rule of Civil Procedure 55(a).  Once the

6  clerk's certificate of default is issued, the moving

7  party may then make an application for entry of a

8  default judgment pursuant to Rule 55(b), as the

9  plaintiff has done here.  See also Kieit Constructors,

10 Inc. v. Franbiltz (ph), 2007 W.L. 4405029 at *2.

11 That's a (W.D.N.Y December of 2007).

12         A default constitutes an admission of all

13 well-pleaded factual allegations in the complaint and

14 the allegations as they pertain to liability are deemed

15 true.  That's from Johann Promotions, Inc. v. El

16 Morteño Restaurant Corporation 2007 W.L. 2891016 at *2.

17 (E.D.N.Y. September 28th, 2007), citing a well-known

18 case in this area, Greyhound Exhibit Group, Inc. v.

19 ELUL Realty Corp. 973 F.3d 155 at 158 (Second Circuit

20 1992), cert. denied 506 U.S. 1080 (1993).

21         A default judgment entered on the well-

22 pleaded allegations in the complaint establishes a

23 defendant's liability.  See for example Garden City

24 Boxing Club v. Morales, 2005 W.L. 2476264 at *3,

25 (E.D.N.Y. October 7th, 2005), citing Bamboo Sales, Inc.

1   v. Ozark Trading, Inc., 58 F.3d 849 at 854 (Second
2   Circuit 1995).
3            The determination of a motion for a default
4   judgment is left to the sound discretion of the
5   district court.  See Shaw v. New York State Department
6   of Civil Service, 168 F.3d 610 at 615 (Second Circuit
7   1999); Merrill Lynch Business Financial Services, Inc.
8   v. Brook Island, 2010 W.L. 2787553 at *3 (E.D.N.Y. July
9   14th, 2010).
10           As the Second Circuit has noted, when
11  determining whether to grant a default judgment, the
12  Court is guided by the same factors which apply to a
13  motion to set aside entry of a default.  See Pikarski
14  v. Galaxyworld.com, Limited (ph), 249 F.3d 167 at 170
15  to 171 (Second Circuit 2001); Enron Oil Corp. v.
16  Diakuhara, 10 F.3d 90 at 96 (Second Circuit 1993).
17           These factors are, one, "whether the
18  defendant's default was wilful," two, "whether the
19  defendant has a meritorious defense to the plaintiff's
20  claims," and three, "the level of prejudice the non-
21  defaulting party would suffer as a result of the denial
22  of the motion for default judgment."  That's from the
23  well-known case of Mason Tenders District Council v.
24  Duchay Construction Corp. (ph), 2003 W.L. 1960584 at *2
25  (S.D.N.Y. April 25th, 2003).

1          The first factor we're going to look at here

2     is wilfulness, and this is where I have some initial

3     questions for you, Mr. Greenberg.

4               MR. GREENBERG:  Yes, your Honor.

5               THE COURT:  This has to do with the service

6     of the summons and complaint.  From what I saw here, I

7     didn't really have any issues with the service of the

8     original complaint, but some questions have arisen with

9     the service of the amended complaint, and that's what I

10    need to inquire about here.

11         Just as background, the plaintiff filed an

12    affidavit of process service Michael Bilato (ph) of

13    P.M. Legal, LLC on April -- excuse me, that's with

14    respect to the first complaint.  Then there is an

15    affidavit from April 27th, 2017 indicating that summons

16    and amended complaint in this action were personally

17    served on Mr. Kulbir Singh on April 1st, 2017 at

18    approximately 7:18 a.m., at 1653 Putney Road, Valley

19    Stream, New York, 11580.  The affidavit accompanying

20    that is from Michael Bilato of P.M. Legal, LLC, the

21    process servers in this case.  With respect to service

22    on Mr. Kulbir Singh of the amended complaint, I have no

23    concerns and no issues.  There's sufficient information

24    here that the service was effective.

25         Turning to Surinder Singh, plaintiff filed

1   an affidavit from process service Louis Perez of P.M.

2   Legal, LLC on May 26th of 2017, indicating that on May

3   5th, 2017, following an attempt to personally serve

4   Surinder Singh at 94-31 116th Street, apartment 1F,

5   Richmond, New York, what's described as Surinder

6   Singh's usual place of abode, a true copy of the

7   summons and amended complaint was affixed to the door

8   at the same.

9           The affidavit states that an additional copy

10  of the summons and amended complaint was mailed to

11  Surinder Singh at Surinder Singh's usual place of abode

12  that same day and that "prior diligent efforts to

13  effect personal service" were made on April 7th, 2017 at

14  9:13 a.m. and April 10th, 2017 at 8:39 p.m.

15          Then with respect to Sukhwinder Singh,

16  plaintiff filed an affidavit from process server again

17  Louis Perez, indicating that on May 12th of 2017,

18  following an attempt to personally serve Sukhwinder at

19  9424 115th Street, Richmond, again now Sukhwinder's

20  usual place of abode, which happens to be the same as

21  listed for Surinder -- just for the record, Surinder is

22  S-u-r-i-n-d-e-r, this latter is Sukhwinder, S-u-k-h-w-

23  i-n-d-e-r.  The process server says a true copy of the

24  summons and amended complaint was affixed to the door

25  at the same address.

1          The affidavit states that an additional copy

2     of the summons and amended complaint was mailed to

3     Sukhwinder at Sukhwinder's usual place of abode, his

4     last-known address, and it's essentially that same day,

5     and that "prior diligent efforts to effect personal

6     service were made on April 7th, 2017 at 9:07 a.m. and

7     April 10th, 2017 at 8:35 p.m.

8          The New York courts are all over the place

9     about nail-and-mail service, not quite as all over the

10    place as the federal courts, but I want to at least put

11    this in the record.  There's nothing in the arguments

12    that were presented here explaining the propriety of

13    nail-and-mail service and first-class mail service used

14    to effect service of process for Surinder, Sukhwinder,

15    Harjit, and Sant Karam.  Under Rule 4(e)(1), an

16    individual within a judicial district of the United

17    States may be served by "following state law for

18    serving a summons in an action brought in courts of

19    general jurisdiction in the state where the district

20    court is located or where service is made."  That's

21    from Rule 4(e)(1).

22          "Under New York law, service of process is

23    governed by CPLR Section 308, which provides that, one,

24    individuals may be served by delivering the summons to

25    the person to be served -- see CPLR 308(1) or (2) -- by

1  delivering the summons 'to a person of suitable age and

2  discretion at the actual place of business, dwelling

3  place, or usual place of abode of the person to be

4  served, along with mailing the summons to the person's

5  last-known address of residence.'"  That's from 308(2).

6  Also see Allstate Insurance Company v. Rosenberg, 771

7  F.Supp.2d 254, 260, 261 (E.D.N.Y. 2011).

8           Where service under paragraphs 1 and 2

9  cannot be made with due diligence, Section 308(4)

10  authorizes an alternative method of service commonly

11  referred to as "nail-and-mail."  By affixing the

12  summons to the door of either the actual place of

13  business, dwelling place, or usual place of abode

14  within the state of the person to be served, then by

15  either mailing the summons to such person at his or her

16  last-known residence or by mailing the summons by

17  first-class mail to the person to be served at his or

18  her actual place of business.

19           The due diligence requirement of Section

20  308(4) should be strictly observed, given the reduced

21  likelihood that a summons served pursuant to that

22  section will be received.  That's from Kopec v. GMG

23  Construction Corp., 2011 W.L. 2650597 at *2 (E.D.N.Y.

24  July 6th, 2011).  Quoting Moran v. Harding, 212 A.D.2d

25  517 (2nd Department 1995).  However, New York courts

1  have not adopted a per se rule as to what constitutes

2  "due diligence" under Section 308.  That's from

3  Allstate Insurance Company v. Rosenberg, 771 F.Supp.2d

4  at 261.

5          See also Barnes v. City of New York, 415

6  N.E.2d 1979.  1979 is the page number.  It's actually a

7  case from 1980 where the court said, "In determining

8  the question of whether due diligence has been

9  exercised, no rigid rule could properly be described."

10  Consequently, courts evaluate whether attempts to

11  effect service of process satisfy the due diligence

12  requirement on a case-by-case basis.  That's from

13  Rosenberg at page 261.

14          Significantly, in evaluating such attempts,

15  "courts should not focus on the quantity of the

16  attempts at personal delivery but on their quality."

17  That's also from Rosenberg and see as well McSorley v.

18  Spear (ph), 50 A.D.2d 652 at 653 (2nd Department 2008).

19          Generally, three attempts at service on

20  three nonconsecutive days will suffice.  See Weifang

21  Xinli Plastic Products v. JPM Trading, 2014 W.L.

22  4244258 at *3.  (E.D.N.Y. August 26th, 2014).  However,

23  some courts find that irrespective of the number of

24  attempts made, the process server must attempt to

25  inquire about the defendant's location and place of

1  employment.  See <u>Serraro v. Staropoli</u>, 94 A.D.3d 1083

2  at 1085 (2nd Department 2012), where the Court said,

3  "For the purposes of satisfying the due diligence

4  requirement, it must be shown that the process server

5  made genuine inquiries about the defendant's

6  whereabouts and place of employment."

7          In addition, some courts require that the

8  process server attempt service on a weekend.  See for

9  example <u>Speth v. Zack</u>, 36 A.D.2d, third, 410, (1st

10 Department 2007), where the court held that the process

11 server's attempts were insufficient to satisfy the due

12 diligence requirement, where none of the attempts was

13 made on a weekend, nor is there any indication that the

14 process server made any inquiries to ascertain the

15 place, meaning the party's whereabouts or place of

16 business.  See <u>Johnson v. Waters</u>, 291 A.D.2d 481 (2nd

17 Department 2002).

18         Despite different courts' interpretations of

19 due diligence under CPLR Section 308(4), federal courts

20 generally look for evidence that the process server

21 attempted to satisfy Section 308(1) or 308(2) before

22 resorting to the nail-and-mail method and tried to

23 ascertain the person's place of employment.  See

24 <u>Serrano v. New York State Department of Environmental</u>

25 <u>Conservation</u>, 2015 W.L. 757268 at *6 (N.D.N.Y. February

1   23rd, 2015), citing the <u>Rosenberg</u> case which I've

2   already cited several times, at page 261.

3          Here it seems that the process server made

4   three attempts to serve Surinder and Sukhwinder.  With

5   respect to Surinder, the process server attempted

6   service at his last-known residence on Friday, April 7th

7   at 9:13 a.m., Monday, April 10th at 8:39 p.m., and

8   Friday, May 5th, 2017 at 6:39 a.m.  As for Sukhwinder,

9   the process server attempted service at his last-known

10  residence on April 7th at 9:07 a.m., Monday, April 10th

11  at 8:35 p.m., and Friday, May 12th at 6:55 a.m., keeping

12  in mind that some of these addresses are the same.

13         Although the process server attempted

14  service on different dates at different times, there's

15  no indication in the relevant affidavits that the

16  process server made any inquiry whatsoever with anyone

17  about Surinder or Sukhwinder's whereabouts or place of

18  employment.  The Court notes and appreciates that

19  service attempts were made outside of business hours,

20  including on Friday morning before 7:00 and Monday

21  evening after 8:00.  However, the question arises, in

22  keeping with the practice of the federal courts and

23  interpreting due diligence requirements under 308(4),

24  whether the process server's attempts meet or fall

25  short of the due diligence requirement where the

1    process server appears to have made no inquiry with

2    anyone about Surinder or Sukhwinder's whereabouts or

3    place of employment.  See Alliance Insurance Company v.

4    Otero, 353 F.Supp.2d 415 at 420 (S.D.N.Y. 2004), where

5    the court found due diligence satisfied where the

6    process server made three attempts and inquired with a

7    neighbor, who confirmed that the defendant lived at the

8    address but could not provide the defendant's place of

9    employment.

10             Personal service may also be made by first-

11   class mail/certified mail under CPLR Section 312(a).

12   Under that section, the latter one, 312(a), a summons

13   may be served by mailing to the person or entity to be

14   served by first-class mail, postage pre-paid, a copy of

15   the summons together with two copies of a statement of

16   service by mail and acknowledgment of receipt in the

17   form of -- sorry, in the form set forth in (d) of this

18   section with a return enveloped, postage pre-paid,

19   addressed to the sender.  However -- and this is a

20   quote from a specific case.  "However, for service to

21   be complete, the defendant must return a signed

22   acknowledgment of receipt to the plaintiff." That's

23   from Robertson v. Allen, 2016 W.L. 205381 at *6

24   (N.D.N.Y. January 15th, 2016), citing specifically CPLR

25   Section 312(a)(B).

1            Here the plaintiff certifies that Harjit and

2  Sant Karam were served by first-class mail on March

3  27th, 2017.  However, the plaintiff does not indicate

4  whether the plaintiff complied with CPLR Section

5  312(a)'s other procedural requirements such as

6  including an acknowledgment of receipt and return

7  envelope, nor is there any indication that Harjit or

8  Sant Karam ever returned signed acknowledgments of

9  receipt.

10            So that's my dilemma at the moment, Mr.

11  Greenberg, and I've got to get answers to those

12  questions.  I'm ready to listen.

13            MR. GREENBERG:  I don't think, without

14  speaking to the process servers, I could answer those

15  questions at this time.

16            THE COURT:  Okay.

17            MR. GREENBERG:  I would ask for time to

18  investigate it with them and have them look at their

19  files.

20            THE COURT:  Okay.

21            MR. GREENBERG:  Or re-serve.

22            THE COURT:  I think you understand the

23  problem here.

24            MR. GREENBERG:  I do.

25            THE COURT:  Okay.  I'm going to go through

1    the rest of this just because I want to have this

2    record today since the witness is here as well, but all

3    of this is going to be subject to some -- I'm not going

4    to be able to make a recommendation --

5              MR. GREENBERG:  I understand.

6              THE COURT:  -- and I'm going to have to tell

7    the judge that, until this issue is resolved, okay?

8              MR. GREENBERG:  Yes, your Honor.

9              THE COURT:  So what I may do is suggest to

10   him that for the moment, he may have to deny this

11   without prejudice and with the right for you to bring

12   it back again, okay?

13             MR. GREENBERG:  Thank you, your Honor.

14             THE COURT:  Let me go through the rest, as I

15   said, at least to make the record, okay?

16             MR. GREENBERG:  Thank you.

17             THE COURT:  Let's assume for the moment that

18   we're going to get the service issues worked out and

19   that service was in fact properly effectuated.  That

20   means then we turn to the second prong of the test,

21   which deals with a meritorious defense.  That whole

22   issue of the service actually goes to the first prong

23   of the test here as to wilfulness.  If we find that the

24   service was proper, there's no question in the Court's

25   mind that the failure to respond here was indeed

```
1   wilful, all right?

2              MR. GREENBERG:  Yes, your Honor.

3              THE COURT:  Turning to the next factor, the

4   Court is unable to make a determination whether the

5   defendants have a meritorious defense since no such

6   defense has been presented to the Court.  See Bridge

7   Oil, Limited, 2008 W.L. 5560868 at *2, Empire State

8   Carpenters Welfare v. Darken Architectural Wood, 2012

9   W.L. 194075 at *3 (E.D.N.Y. January 17th, 2012).

10             Although defendants' default constitutes an

11  admission of all the factual allegations in the

12  complaint as they relate to liability, plaintiffs must

13  nevertheless demonstrate that the uncontested

14  allegations set forth valid claims.  That's from Said

15  v. SPS Electronics, 2010 W.L. 1265186 at *2 (E.D.N.Y.

16  February 24th, 2010).

17             Plaintiff's amended complaint asserts four

18  causes of action.  First, violations of the Fair Labor

19  Standards Act for failure to pay plaintiff overtime

20  wages.  Second, violations of the New York Labor Law

21  for effectively the same behavior.  Third, violations

22  of the New York Labor Law for failing to provide wage

23  notices.  And four, violations of the New York Labor

24  Law for failure to provide wage statements.

25             I turn now to the first claim, which is
```

1  liability under the FLSA.  "To establish a claim under

2  the FLSA, plaintiff must prove the following:  Number

3  one, the defendant is an employer subject to the Fair

4  Labor Standards Act.  Two, the plaintiff is an employee

5  within the meaning of the FLSA.  Three, the employment

6  relationship is not exempted from the FLSA."  That's

7  from Saucedo v. On The Spot Audio Corporation, 2016

8  W.L. 8376837 at *4 (E.D.N.Y. December 21st, 2016).

9  Report and recommendation adopted by 2017 W.L. 780799

10  (E.D.N.Y. February 28, 2017).  Vacated on other grounds

11  sub nom, Saucedo v. On The Spot Audio Corporation, 2018

12  W.L. 4347791 (E.D.N.Y. January 23rd, 2018).

13          A defendant is an "enterprise engaged in

14  commerce or in the production of goods for commerce" if

15  the defendant is an enterprise that "has employees

16  engaged in commerce or in the production of goods for

17  commerce, or that has employees handling, selling or

18  otherwise working on goods or materials that have been

19  moved in or produced for commerce by any person, and

20  whose annual gross volume of sales made or business

21  done is not less than $500,000."  That's from 29 United

22  States Code Section 203(s)(1)(A)(i).

23          An employer is subject to both the minimum

24  age and overtime provisions of the FLSA if either, one,

25  their employees are engaged in commerce, or two, the

1  employer is an enterprise engaged in commerce.  That's

2  from 29 United States Code Sections 206 and 207.  See

3  Padilla v. Menlapaz, 643 F.Supp.2d 298 at 299 (E.D.N.Y.

4  2009).  The statute defines "commerce" as "trade,

5  commerce, transportation, transmission or communication

6  among the several states or between any state and

7  anyplace outside thereof."  That's from Section 203(b).

8  These two methods of establishing FLSA coverage are

9  known as "individual coverage" and "enterprise

10 coverage" respectively.  Jacobs v. New York Foundling

11 Hospital, 483 F.Supp.2d 251 at 257 (E.D.N.Y. 2007).

12             Plaintiff has pleaded that at all relevant

13 times, Sant Karam had employees engaged in commerce or

14 in the production of goods for commerce, including

15 plaintiff, and had a gross annual of at least $500,000.

16 That's from paragraphs 47 to 50 of the amended

17 complaint.  Plaintiff has therefore sufficiently

18 pleaded that Sant Karam is subject to the FLSA.  See

19 Furman v. Las Delicias Peruzuanas Restaurant, Inc., 93

20 F.Supp.3d 19 at page 33 (E.D.N.Y. March 19th, 2015),

21 where the court found a complaint which simply restated

22 the statutory definition to be sufficient because it

23 was reasonable to infer that the myriad goods necessary

24 to operate a restaurant with an eat-in dining area and

25 over $500,000 in annual sales do not exclusively come

1   from New York State.

2          As for the individual defendants, Harjit,

3   Kulbir, Surinder, and Sukhwinder Singh, plaintiff

4   alleges that during the relevant period of time, each

5   individual defendant was a corporate officer of Sant

6   Karam -- that's from the amended complaint paragraphs

7   12 to 15 -- who exercised operational and significant

8   business function control over Sant Karam and actively

9   participated in running the day-to-day operations of

10  their B.P. gas station.

11         Under the FLSA, an employee is "any person

12  acting directly or indirectly in the interests of an

13  employer in relation to an employee."  That's from 29

14  United States Code Section 203(d).  A person is defined

15  as "an individual, partnership, association,

16  corporation, business trust, legal representative, or

17  any organized group of persons."  That's from Section

18  203(a).  To employ means "to suffer or permit to work."

19  That's from Section 203(g).  An individual may be

20  liable as an employer under the FLSA so long as he

21  exercises "operational control" over the employee in

22  question.  See a well-known case, Irizarry v.

23  Katsamatedis (ph), 722 F.3d 99 at 110 (Second Circuit

24  2013).  Individuals who are found to be employers under

25  the FLSA may be held jointly and severally liable to

1   the plaintiff.  See Moon v. Qwon, 248 F.Supp.2d 201 at

2   237 (S.D.N.Y. 2002).

3          Based on the allegations in the complaint

4   regarding individual defendants Harjit, Kulbir,

5   Surinder, and Sukhwinder Singh, plaintiff has

6   adequately alleged the elements necessary to state a

7   claim against each as an employer.  Thus, Sant Karam

8   and the individual defendants would be jointly and

9   severally liable to the plaintiff.  See Saucedo, 2016

10  W.L. 8376837 at *5.

11         As to an employee, under the Fair Labor

12  Standards Act, an employee is "any individual employed

13  by an employer," a very helpful definition.

14  Nonetheless, that's from Section 203(e)(1).  "In so far

15  as plaintiff's complaint alleges that defendants

16  employed the plaintiffs within the statutory meaning,

17  it follows that for purposes of this default, they

18  qualify as employers under the FLSA."  That's from the

19  Furman case, 93 F.Supp.3d at page 32.

20         Because the plaintiff has alleged his status

21  as an employee with defendants and because these

22  allegations are plausible and sufficiently supported,

23  plaintiff has satisfied the second element of his FLSA

24  claim, keeping in mind plaintiff does not have to prove

25  his claims here.  He only has to sufficiently state

1    them in a legal context.

2           As to the exemption issue, "The issue of

3    whether an employee's responsibilities render the

4    employee exempt from the FLSA's overtime provision is a

5    question of law."  That's from McBeth v. Gabrielli

6    Truck Sales, Limited, 768 F.Supp.2d 383 at 387

7    (E.D.N.Y. 2010).  The Court is satisfied that there are

8    no exemptions under the FLSA which would in these

9    circumstances, based on the nature of the plaintiff's

10   employment with the defendant as landscapers.  Based on

11   the above analysis, the plaintiff has pleaded the

12   necessary elements for a claim under the FLSA.

13          As to liability under the New York Labor

14   Law, for essentially the same reasons, plaintiffs have

15   also adequately pleaded a claim under the New York

16   Labor Law, since the components are the same.  See

17   Saucedo, 2016 W.L. 8376837 at *6, where the court said

18   the New York Labor Law and the FLSA are analytically

19   nearly identical.

20          The final factor to consider is whether the

21   non-defaulting party would be prejudiced if the motion

22   for default were to be denied.  Denying this motion

23   would be prejudicial to the plaintiff since there are

24   no additional steps available to secure relief in this

25   Court.  That's from Bridge Oil, Limited, 2008 W.L.

1    5560868 at *2.   Trustees of the Pavers and Road

2    Builders District Council Welfare Pension Annuity and

3    Apprenticeship, Skill Improvement and Safety Funds v.

4    JREM Construction Corp., 2013 W.L. 618738 at *4

5    (E.D.N.Y. January 28th, 2013).  If a judgment is not

6    granted here, the plaintiff will have no alternative

7    legal redress to recover his statutorily entitled wages

8    for work done.

9          Since all three factors necessary to

10   establish a default have been satisfied, namely

11   wilfulness, the absence -- let's put it this way:  I'm

12   assuming for the moment that wilfulness will be proven

13   once we get the service issues resolved.  If that

14   proves true, that factor plus the absence of

15   meritorious defenses and prejudice in the absence of a

16   default judgment would be clear here, I find that the

17   plaintiff has, taking those things into account,

18   sufficiently pleaded the claim.  I would recommend,

19   contingent on us resolving this other issue,

20   respectfully recommend to Judge Spatt that judgment as

21   to liability be entered against the defendants.

22         Now let's talk about the relief sought here.

23   Although a default judgment entered on the well-pleaded

24   allegations in the complaint establishes a defendant's

25   liability, a plaintiff must still prove damages.  See

1  <u>Cement and Concrete Workers District Council Welfare</u>

2  <u>Fund, et al. v. Metro Foundation Contractors, Inc.</u>, 699

3  F.3d 230 (Second Circuit 2012).  In determining damages

4  not susceptible to simple mathematical calculations,

5  Rule 55(b)(2) of the Federal Rules of Civil Procedure

6  gives courts discretion to determine whether an

7  evidentiary hearing is necessary or whether detailed

8  affidavits or documentary evidence are sufficient.

9          "The Second Circuit has approved the holding

10  of an inquest by affidavit without an in-person court

11  hearing, as long as the court has insured that there

12  was a basis for the damages specified in the default

13  judgment."  That's from <u>LaBarbera v. Les Sub-surface</u>

14  <u>Plumbing</u> (ph), 2008 W.L. 906695 at *3 (E.D.N.Y. April

15  3rd, 2008), quoting <u>Transatlantic Marine Claims Agency</u>

16  <u>v. Ace Shipping Corporation</u>, 109 F.3d 105 at page 111

17  (Second Circuit 1997).  Despite the submissions in

18  support of the plaintiff's motion for entry of a

19  default judgment, the Court determines that an in-

20  person inquest is necessary for a determination of the

21  specific damages.

22          Now turning to those damages.  The

23  plaintiff's motion for a default judgment sets forth

24  calculations of damages and the information that I'm

25  listing here is taken from the motion and accompanying

1    exhibits.  The plaintiff states that he worked 65 hours

2    per week, alleging that he worked Monday through Friday

3    from 4:00 p.m. to 11:00 p.m. and Saturday from 10:00

4    a.m. to Sunday at 4:00 p.m.  Plaintiff further alleges

5    that he was paid $10 straight time for all 65 hours

6    worked per week and therefore was underpaid 25 hours

7    each week.  According to the plaintiff's estimated

8    calculation of damages spreadsheet which was attached

9    to the motion, the plaintiff is owed back wages for 25

10   overtime hours for seven weeks in 2013, 28 weeks in

11   2015, and 52 weeks in 2014.

12           According to the plaintiff, since he should

13   have received $15 an hour for each hour worked over 40

14   hours a week, he's owed $5 an hour for 25 hours for 87

15   weeks.  He claims that he is then owed $125 per week

16   for seven weeks in 2013, $125 per week for 52 weeks in

17   2014 and '15.  So what I would like to do now because I

18   have some questions about this and I'm going to let you

19   ask the questions to get the record established here,

20   is to swear in your client and have him take the

21   witness stand, all right?

22           MR. GREENBERG:  Yes, your Honor.

23           THE COURT:  Why don't you step up.

24           (Witness is sworn.)

25           THE CLERK:  Please state your name for the

1    record.  Just state your name.

2              THE COURT:  You need to state your name for

3    the record.

4              MR. GREENBERG:  What is your name?

5              THE WITNESS:  Ayhan Tartici.

6              THE COURT:  My goal, Mr. Greenberg, is to

7    get as many facts in here as we can, okay?

8              MR. GREENBERG:  Yes, your Honor.  May I

9    begin, your Honor?

10             THE COURT:  Yes, go ahead.

11             MR. GREENBERG:  Thank you.

12   DIRECT EXAMINATION

13   BY MR. GREENBERG:

14        Q.  So you know we're here to talk about the work

15   you did at the gas station, correct?

16        A.  Yes.

17        Q.  All right.  Going back to 2013, can you tell

18   us the name of the company that you worked for in the

19   gas station?

20        A.  Sant Karam, Inc.

21        Q.  Sant Karam S, Inc., technically?

22        A.  Yes.

23        Q.  What type of business did they have?

24        A.  Gas station and store.

25        Q.  What kind of store did they have as part of

1    the gas station?

2         A.   Convenience store.

3         Q.   What did you do for the company?

4         A.   I work as cashier and, you know, inside the

5    store, like cleanup and filling, you know.

6              MR. GREENBERG:  May I lead a little bit,

7    your Honor?

8              THE COURT:  Yes.

9              MR. GREENBERG:  Thank you.

10   BY MR. GREENBERG:

11        Q.   So if a customer came in and paid cash, would

12   you service that customer for the gas?

13        A.   Yes.

14        Q.   Then there's like a mini-store attached to the

15   gas station, correct?

16        A.   Yes.

17        Q.   And you would sell all sorts of items from

18   paper goods to soda and cigarettes and such?

19        A.   Yes, beer, cigarettes, coffee, ice cream,

20   everything, like chips.

21        Q.   Okay.  And you began working there on November

22   8, 2013, correct?

23        A.   Yes.

24        Q.   And your first full week began when?

25        A.   November 10.

1      Q.  2013?

2      A.  Yes.

3      Q.  What was the last date of your employment

4  working for them?

5      A.  July, 2015.

6      Q.  Was that July 12, 2015?

7      A.  Yes.

8      Q.  But the last full week ended on the 11th, is

9  that correct?

10      A.  Yes, because only one day was different.

11      Q.  All right.  When you worked at the gas

12  station, were you given any formal break times that you

13  could take?

14      A.  No.

15      Q.  In fact, were you the only person working at

16  the gas station in the hours that you were working at

17  the gas station?

18      A.  Yeah, I was.

19      Q.  How many days a week did you work there?

20      A.  Seven.

21      Q.  What was your schedule Monday through Friday?

22      A.  4:00 to 11:00 p.m.

23      Q.  Okay.  On Saturday through Sunday, what was

24  your schedule?

25      A.  Saturday, I was doing 10:00 a.m. until Sunday

1    afternoon at 4:00 p.m.

2         Q.   So that's about a thirty-hour time period?

3         A.   Yes.

4         Q.   Did you get to eat during that time period?

5         A.   Yeah, I did.

6         Q.   How did you accomplish that?

7         A.   I'm living only two blocks away from gas

8    station.  My family, my wife and my kids would bring my

9    food.

10        Q.   So they would bring you food.  Would you take

11   a formal break to eat or how would you eat?

12        A.   No, there is no time for break because I'm

13   alone, you know.  If customer comes at the same time, I

14   have to serve them, you know.

15        Q.   What would you do if you had to go to the

16   men's room, to go to the bathroom?

17        A.   We have a sign that says, we'll be back in ten

18   minutes, we're using the bathroom.

19        Q.   Would you lock the door?

20        A.   Yes, everything, all the doors.

21        Q.   And then take care of your needs and then take

22   the sign down and unlock the door?

23        A.   Yeah, when I come back, I open the door and

24   take the sign out and continue work.

25        Q.   You were working a minimum of 65 hours per

1    week, is that correct?

2         A.  Yes.

3         Q.  All right.

4              THE COURT:  Let me stop you there for a

5    second if you don't mind.  There are a couple of things

6    I want to ask.  When you were working Monday through

7    Friday 4:00 to 11:00, was that every single day for

8    those two and a half or more years that you were

9    working there?  Your schedule never changed?

10             THE WITNESS:  No, it never changed because I

11   have a morning job, that's why.

12             THE COURT:  Okay.  You say you worked alone.

13             THE WITNESS:  Right.

14             THE COURT:  How did you get into the station

15   or the business when you got there?

16             THE WITNESS:  What do you mean?

17             THE COURT:  How did you -- first of all,

18   were you taking over for somebody else who was on

19   shift?

20             THE WITNESS:  Yeah.  When I come at 4:00,

21   the morning guy is leaving.  When I come, I take from

22   him.

23             THE COURT:  Okay.  So at 11:00 at night,

24   when you were leaving, what did you do?

25             THE WITNESS:  Night shift guys coming and I

1    leave, he stay.

2              THE COURT:  So the station was open 24 hours

3    a day?

4              THE WITNESS:  24 hours, yes.

5              THE COURT:  Let me ask you about Saturday to

6    Sunday because this is where I have -- need to clarify

7    something.  You say you worked for thirty hours

8    straight.

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  When you started this

11   job, was that explained to you by the owners?

12             THE WITNESS:  I mean not -- yeah, because

13   they give me the schedule.  They told me that's the

14   hours, will you come?  Yes.

15             THE COURT:  Okay.  And the schedule that

16   they gave you, was it in writing?

17             THE WITNESS:  No, just by talking, you know.

18             THE COURT:  They just told you what hours

19   you would be working.

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.  And they made it clear to

22   you from the beginning that you were going to be there

23   from 10:00 a.m. on Saturday morning until 4:00 in the

24   afternoon the following day?

25             THE WITNESS:  Yes.

1            THE COURT:  When were you supposed to sleep?

2            THE WITNESS:  Well, when I worked there on

3   the weekends, I don't sleep.

4            THE COURT:  Okay.  They told you that you

5   were going to be there for more than 24 hours in that

6   time period?

7            THE WITNESS:  Yeah, only weekends, yes.

8            THE COURT:  Okay.  What did they tell you

9   about that?

10           THE WITNESS:  Well, they say, we don't have

11  -- we just don't want to hire any employee for one day

12  so we need one guy who can stay, so I said okay.

13           THE COURT:  And the entire time that you

14  were employed, were you working every single Sunday?

15  Nobody else ever worked any of those Sundays?

16           THE WITNESS:  No.  When I leave at 4:00,

17  other person come in.

18           THE COURT:  Okay.  So no one else ever came

19  to relieve you during that time.

20           THE WITNESS:  No.

21           THE COURT:  Go ahead, Mr. Greenberg.

22  BY MR. GREENBERG:

23      Q.  Did you ever have to punch into a clock for

24  your employer?

25      A.  No, we don't have punch clock.  We writing on

1    the shift paper, you know.

2         Q.  So that's my next question.  Did you make your

3    employer aware in writing of the hours that you were

4    working every week?

5         A.  Yes, we do.

6         Q.  Take your time and explain to the Court how

7    you did that.

8         A.  Which --

9         Q.  The judge.

10             THE COURT:  How did you keep track of your

11   time, basically?

12             THE WITNESS:  Oh, the time.  When we get in

13   the store, we writing, you know, what time we came.

14             THE COURT:  Let me stop you.  You write down

15   what time you got there.

16             THE WITNESS:  Yeah, for the --

17             THE COURT:  Is there some form you were

18   writing that on or just on a piece of scrap paper?

19             THE WITNESS:  No, there's a paper which

20   shows you like everything on it, like how many

21   cigarettes we have, how many beer we have, which

22   employee worked that day and how many hours, what time

23   start, how many carton of cigarettes we have.

24   Everything is on that paper that we call the shift

25   paper.

1               THE COURT:  So it was basically an

2     inventory, what was in the store at the time, right?

3               THE WITNESS:  That's not inventory, that's

4     day shift, like the shift.

5               THE COURT:  Okay.

6               THE WITNESS:  Like you know, after end of

7     the day, we write all the sales on it.

8               THE COURT:  I see.

9               THE WITNESS:  Like gas, how much regular gas

10    we sell.

11              THE COURT:  So it's how much you sold.

12              THE WITNESS:  Yeah, how much we sold regular

13    gas, how much super, how much diesel.  Everything is on

14    that.

15              THE COURT:  Okay.

16              THE WITNESS:  And there is like cigarettes,

17    beer, coffee, lotto, you know, everything is on there.

18    And there is -- on the side of the corner is the

19    employee name.

20              THE COURT:  Okay.

21              THE WITNESS:  How many hours you worked, how

22    many drops you did, safe drops, and how much was it.

23    Everything is on that shift paper, you know.

24              THE COURT:  What happened to that sheet of

25    paper?

1              THE WITNESS:  They have it, the owner.

2              THE COURT:  How often did you have to hand

3    that sheet of paper in?

4              THE WITNESS:  Every day.

5              THE COURT:  Every day?

6              THE WITNESS:  Every day.

7              THE COURT:  Okay.  Do you know what the

8    business did with that, with those sheets of paper?

9              THE WITNESS:  When I left, we was keeping

10   everything in the office, you know, and they come in

11   and grab it next day.

12             THE COURT:  Okay.

13             THE WITNESS:  With the money, with the safe

14   money, everything.

15             THE COURT:  Okay.

16             THE WITNESS:  They come and get it.

17             THE COURT:  Okay.

18             THE WITNESS:  And they check after like --

19   we making whatever we making in the gas station.

20             THE COURT:  Yes.

21             THE WITNESS:  I believe they check it in the

22   office, you know.

23             THE COURT:  Were you on some kind of an

24   honor system?  Was anybody ever checking to make sure

25   you were there?

1                THE WITNESS:  I believe they checking

2      because they making deposits, you know.  They opened

3      the safe.  Whatever money we throw in, they come next

4      day, they take it.  It shows over there like I said,

5      how many cigarettes they sell, how many lotto, how many

6      beers.

7                THE COURT:  But as far as the number of

8      hours you were working, they were basically taking your

9      word for it based on what you filled in on the sheet,

10     right?

11               THE WITNESS:  Yeah, we fill it up and they

12     come and grab it next day, you know.

13               THE COURT:  Were you always paid the amount

14     of hours that showed on that sheet?

15               THE WITNESS:  Yeah.

16               THE COURT:  Okay, but straight time.

17               THE WITNESS:  Straight.

18               THE COURT:  Okay.  Go ahead, Mr. Greenberg.

19               THE WITNESS:  Every Sunday when I leave for

20     new week, we getting paid and we take the -- from the

21     -- they know everything.  Everything is on that paper.

22               THE COURT:  Okay.

23     BY MR. GREENBERG:

24          Q.  Did you pay yourself?

25          A.  Yeah.

1      Q.   So am I correct that you would write down on

2   one of these sheets the number of hours that you

3   worked, then you would deduct $10 an hour for every

4   hour you worked from the cash that you would put in the

5   little drop box?

6      A.   Yeah.  You know like how you drop at safe?

7      Q.   Yes.

8      A.   You know, like money, safe money.  We don't

9   want to keep money too much in the register and we --

10  let's say you have $600 or $700.  You write your name,

11  you take your pay out from register, and they have my

12  name over there.  Same thing with when we leave Sunday,

13  I get paid like that.  I make the safe, put my name,

14  but I take my money and they're okay with that.

15     Q.   Did they ever question the amount of hours

16  that you put down that you worked every week?

17     A.   No.

18     Q.   Was it pretty much the same hours every single

19  week?

20     A.   Yeah.

21     Q.   As you sit here now, do you believe that if

22  the employer was to have maintained those records when

23  you would write down the hours and they were to come to

24  court, they would be able to show the Court that you

25  listed those same hours every week and that you

1   deducted the cash for it, correct?

2       A.   Yes.   I wish I can have copy to show, you

3   know.

4           THE COURT:   Mr. Greenberg, hang on one

5   second.

6           Did you get paid every -- did you take your

7   pay every day or once a week?

8           THE WITNESS:   No, every week, only Sunday.

9           THE COURT:   Once a week, okay.

10          THE WITNESS:   Yeah, only Sunday when I

11  leave.

12          THE COURT:   So when you left on Sunday,

13  whatever cash was there, you would count out the number

14  of hours you worked.   What was your rate of pay, $10 an

15  hour?

16          THE WITNESS:   $10, yeah.

17          THE COURT:   Times $10 an hour.   You'd take

18  that amount of cash.

19          THE WITNESS:   Right.

20          THE COURT:   And that was your pay.

21          THE WITNESS:   Right.

22          THE COURT:   Did you ever leave notes for

23  them about how much you were taking?

24          THE WITNESS:   Oh, yeah.   They know like

25  every week, we do same.

```
1              THE COURT:  Okay.

2              THE WITNESS:  I do like a safe drop.  I put

3    my name and $650 or whatever and put safe drop and the

4    envelope number, like which number envelope that I use.

5    So when they open that envelope, they know my pay I got

6    from there.

7              THE COURT:  Okay.

8              THE WITNESS:  There is a receipt coming out

9    from register, it says pay out.  That's the way I get

10   paid.

11             THE COURT:  Okay.

12   BY MR. GREENBERG:

13        Q.  Did you take any vacations or breaks from work

14   during the years you worked for this employer?

15        A.  No.

16        Q.  Were there people that relieved you -- in

17   other words, other than the thirty-day period -- let me

18   say it this way:  Including the thirty-hour period, I

19   should say, did you work until somebody relieved you,

20   like tag?  They came in and said, we're ready to go?

21        A.  Yeah, because otherwise, I can't leave, like

22   somebody has to come take over.

23        Q.  Were there times when the relief person didn't

24   show up?

25        A.  No, not show up but sometimes was late a
```

Tartici - Direct                                        42

1   couple hours.

2       Q.  So there were times when the relief person

3   would show up what, one or two hours late?

4       A.  One hour, two hours, yeah.

5       Q.  Would you continue to work the one or two

6   hours until somebody showed up?

7       A.  Yeah, I have to.  I have to.  Nobody else

8   there.  I have to.

9       Q.  At the end of the week then, did you increase

10  your pay by either $10 or $20, depending on whether

11  they showed up one or two hours late?

12      A.  Yeah.  Sometimes I take like two hours extra

13  or sometimes I come to work like two hours late, you

14  know.  Like instead of 4:00, I come 5:00, you know, the

15  same guy is coming.

16      Q.  By coming let's say two hours late, instead of

17  taking the money, you were trying to maintain the same

18  number of hours every week?

19      A.  Yeah, trying to keep my salary, yeah.

20      Q.  And get the same pay every week.

21      A.  Right.

22          MR. GREENBERG:  I think that's pretty much

23  it, your Honor.

24          THE COURT:  Let me just ask a few more

25  questions, if you don't mind.

1          MR. GREENBERG:  Please, thank you, your

2    Honor.

3          THE COURT:  When you were hired or at any

4    time during the time you were employed there, did you

5    ever have a conversation with any of the owners about

6    overtime?

7          THE WITNESS:  No, we never talk about

8    overtime but I asked a couple of time raise.  They say

9    they gonna give but I never get.

10         THE COURT:  So you made an inquiry of them

11   at some point why you weren't being paid overtime?

12         THE WITNESS:  I'm sorry?

13         THE COURT:  Did you ever ask them why you

14   weren't --

15         THE WITNESS:  Overtime?  No, because they

16   say this is the hour, you know.

17         THE COURT:  So when you first met with them

18   and throughout the time of your employment, they told

19   you you're making $10 an hour and that's it.

20         THE WITNESS:  Yeah.

21         THE COURT:  Okay.

22         THE WITNESS:  But they say -- when I go over

23   there for hiring --

24         THE COURT:  Yes.

25         THE WITNESS:  -- I talk to manager.  Manager

1    told me like, you know, you're gonna start working a

2    couple months and then they will raise you up, but I

3    never got a raise.

4              THE COURT:  So you were paid $10 an hour

5    throughout the time you were there.

6              THE WITNESS:  Yes, ma'am.

7              THE COURT:  Okay.  And no one ever came to

8    talk to you about being paid overtime or not being paid

9    overtime.

10             THE WITNESS:  No one.

11             THE COURT:  Did you ever go to anybody

12   yourself, whether it was another shift person or any

13   one of the supervisors, and tell them you thought you

14   were supposed to be getting overtime?

15             THE WITNESS:  I asked with the manager

16   talking.

17             THE COURT:  Yes.

18             THE WITNESS:  He said, they're gonna take

19   care of you, like I said, but --

20             THE COURT:  It never happened.

21             THE WITNESS:  Never happened.

22             THE COURT:  Okay.

23   BY MR. GREENBERG:

24       Q.  Did you say you asked for a raise?

25       A.  I did.

1          Q.   What happened?

2          A.   They say okay, we thinking, but never get it.

3          Q.   Never got the raise.

4          A.   Never got the raise.

5               THE COURT:  Okay.

6   BY MR. GREENBERG:

7          Q.   Did you ask once or more than once?

8          A.   Twice.

9          Q.   Twice?

10         A.   Yeah.

11         Q.   And they just ignored it?

12         A.   They didn't tell me directly.  They tell me

13   with the manager -- I'm asking manager like, what

14   happened?  Oh, they're gonna come talk to you but never

15   happened.

16              THE COURT:  Didn't happen.

17              THE WITNESS:  Never happened.

18              THE COURT:  I'm not sure you can answer this

19   but let me ask the question.  When you were working in

20   the store, did you ever notice any posters in the store

21   anywhere or around the store anywhere or even around

22   the pumps or that part of the gas station that were

23   from the Department of Labor saying what your wages

24   were supposed to be or how you were to get paid?

25              THE WITNESS:  There was one sign inside the

1  store, where they keep all the stock, like garbage bags

2  and this, but it was already full.  I never think to

3  look or read, you know.

4        THE COURT:  When you first came to work

5  there, nobody ever gave you a piece of paper saying,

6  here's the number of hours you're going to be working

7  each week and here's what your rate of pay is.

8        THE WITNESS:  No, there was no paperwork.

9        THE COURT:  Okay.  All right, I think we're

10  good.

11        MR. GREENBERG:  Thank you, your Honor.

12        THE COURT:  You can step down, Mr. Tartici,

13  thank you.

14        THE WITNESS:  Thank you, your Honor.  Thank

15  you.

16        THE COURT:  I just want to talk for a couple

17  of minutes about the chart of the damages, okay?

18        MR. GREENBERG:  Yes, your Honor.

19        THE COURT:  I don't think I have that with

20  me.  Just bear with us for a minute, all right?

21        MR. GREENBERG:  Yes, your Honor.

22        (Pause in proceedings.)

23        THE COURT:  I'm looking at the chart now.

24        MR. GREENBERG:  Yes, your Honor.

25        THE COURT:  I want to get the numbers

1  resolved here.  Also, in looking at this chart, there

2  were two basically corrections that were made in

3  response to some additional information that I had

4  asked for, and I received back a letter from Mr.

5  Williams.  The two things in here that impact the

6  chart, just so we have this in the record -- it says

7  here the start date of December 30th with respect to the

8  New York Labor Law section of the chart was pasted in

9  error.  That date should actually read November 10th of

10 2013.

11          MR. GREENBERG:  Yes, your Honor.

12          THE COURT:  Do you see that?

13          MR. GREENBERG:  Yes, your Honor.

14          THE COURT:  So I'm going to amend obviously

15 the chart to that extent.

16          MR. GREENBERG:  Thank you.

17          THE COURT:  As Mr. Williams said, with that

18 change, however, there's no impact on the overall

19 calculation because the numbers of weeks worked column

20 here is actually correct that it was seven weeks,

21 right?

22          MR. GREENBERG:  Yes, your Honor.

23          THE COURT:  Okay, let's see.  Also on page 2

24 of Mr. Williams' letter -- I'm referring now to DE-52

25 in the docket.  On page 2, he states the following:

1   "Additionally, the undersigned submits that since

2   plaintiff's motion for a default judgment was filed,

3   there have been decisions in this district that have

4   held that the statutory maximum allowed under New York

5   Labor Law Section 195(1) and (3), prior to February

6   27th, 2015, which is $2,500, cannot be added to the

7   statutory maximum allowed on or after February 27th,

8   2015 which is $5,000, as plaintiff's memorandum of law

9   and damage chart reflect.  In other words, $5,000 has

10  been held to be the absolute maximum a plaintiff can

11  receive under Labor Law 195(1) and (3).  And as such,

12  the plaintiff only seeks $5,000, the statutory maximum

13  on these claims, rather than the $7,500 indicated in

14  his motions papers."

15          The section of the New York Labor Law 195

16  chart, to the right, the last column, it says

17  "statutory penalties."  That $7,500 figure at the

18  bottom of each of those should really say $5,000,

19  correct?

20          MR. GREENBERG:  Yes, your Honor.

21          THE COURT:  Okay.  I don't know if you have

22  a calculator here but we're going to go over these

23  numbers so that I have them in the record.  I'm asking

24  my trusty law clerk to do my calculations for me, all

25  right?

1              MR. GREENBERG:  I'm going to turn on my

2    phone.  Thank you.  I just need a minute for it to turn

3    on, your Honor.

4              THE COURT:  Okay.

5              MR. GREENBERG:  Thank you.

6              THE COURT:  Looking to the overtime

7    compensation provision for both the Fair Labor

8    Standards Act and the New York Labor Law, for the year

9    2013, the number of weeks at issue here is 7, the

10   number of hours worked per week is 65, which means each

11   week that the plaintiff was working, he was actually

12   accumulating 25 hours of overtime but being paid at a

13   straight rate for that time, when he should have been

14   paid -- the straight rate being $10 an hour, where he

15   should have been paid $15 an hour for those extra 25

16   hours.  So the difference here is $5 per hour of

17   overtime hours.

18              If you multiply it out then, 25 times 5, you

19   come up with $125 of overtime due and owing for each

20   week.  Multiply that by 7 for example, for the year

21   2013, the number comes out to $875.  That much I can do

22   in my head.  From there, it's going to get a little

23   more complicated, all right?

24              MR. GREENBERG:  Yes, your Honor.

25              THE COURT:  So now we're in 2014.  Mr.

1    Tartici testified he worked throughout that year, so

2    we're essentially talking about 52 work weeks.  Again,

3    he testified he was working the same hours every week,

4    so we have 65 hours of work time actually accumulated,

5    which again as we saw in the first calculation, means

6    that he was entitled to 25 hours of overtime being paid

7    at time and a half.  So coming across the columns here

8    and using that $5 figure again for the 25 hours for

9    each of the individual weeks, it comes out to $125 a

10   week, and here's where you have to help me out, 52

11   weeks times $125.  What do you get?

12             THE CLERK:  $6,500.

13             THE COURT:  $6,500?

14             MR. GREENBERG:  $6,500.

15             THE COURT:  Very good.  Okay, so we're

16   agreed on that.  Then using that same formula for 2015,

17   the number of weeks worked here is 28.  The plaintiff

18   testified that he stopped working as of July 11th, is

19   that right?

20             MR. GREENBERG:  Yes, your Honor.

21             THE COURT:  July 12th, I'm sorry.  He had

22   that one extra day, July 12th.  Again, 65 hours, 25

23   hours of overtime at the rate of $5 brings him to $125

24   due and owing for each week multiplied by 28 weeks.

25   What do you get for that?  $3,500, good, the same

1    thing.  So if we can add up the $875, $6,500 and

2    $3,500, $10,875 is our calculated number.  It matches

3    the number on the chart, so I find that that is the

4    amount of wages due and owing for overtime under the

5    FLSA New York Labor Law provisions for Mr. Tartici for

6    the period of his employment.

7         Moving down to the wage notice statutory

8    penalties, we know at this point that the maximum,

9    regardless of the time that he was working, can't

10   exceed $5,000.  So for the first round, for the years

11   2013 through 2015, the maximum number here is $5,000 by

12   statute, so I am adopting that finding and using the

13   $5,000 as the correct number.  That is for the wage

14   notice violations.

15        Then we go down to the wage statement

16   statutory penalties.  Once again, by statute at this

17   point, the maximum that's collectible is $5,000, so

18   that is the number that I'm adopting for that violation

19   and find that Mr. Tartici is owed $5,000 based on the

20   Labor Law 195(3), which is the wage statement statutory

21   penalties.  So now we have, taking together the $5,000

22   and the $5,000 and adding it to the overtime

23   compensation, you're talking of an overall number then

24   up to now of $20,875.  Agreed?

25        MR. GREENBERG:  Yes, your Honor.

1              THE COURT:  Okay.  So now let's go over to

2    the liquidated damages provision.  Let's talk about the

3    interest issue first because the interest is only on

4    the wages.  I don't know, Mr. Greenberg, if this was

5    you who calculated this out or Mr. Williams.  But in

6    any event, I would just make a notation here since I

7    had to check on this myself as to when the actual --

8    what date really this runs from.

9              I'm looking at a case called Kernes v.

10   Global Structures, LLC.  The citation is 2016 W.L.

11   880199 (S.D.N.Y. March 1st, 2016).  It's Magistrate

12   Judge Freeman's report and recommendation to Judge

13   McMann, Colleen McMann, about FLSA calculation.  The

14   reason I bring this to your attention is because

15   there's a very helpful section on the pre-judgment

16   interest provision which we're talking about here now

17   and I just want to put this in the record.

18             The court says, "Generally, the decision to

19   award pre-judgement interest is discretionary and is

20   based on the need to fully compensate the wronged

21   party, the fairness of the award and the remedial

22   purpose of the statute involved.  A plaintiff who

23   recovers liquidated damages under the FLSA, however, is

24   not also entitled to pre-judgment interest on his or

25   her FLSA damages."  The upshot of this being you can

1  get interest on the New York Labor Law portion of the

2  award but not on the FLSA provision.  I trust either

3  you're aware of that or at least you understand that at

4  this point, Mr. Greenberg.

5            MR. GREENBERG:  I understand it now, your

6  Honor.

7            THE COURT:  Okay.  It cites to a case that I

8  spoke about earlier this afternoon, which is Furman v.

9  Las Delicias Peruanas Restaurant, Inc., 93 F.Supp.3d 19

10  at page 48 (E.D.N.Y. 2015), which says, "It's well-

11  settled that in an action for violations of the FLSA,

12  pre-judgment interest may not be awarded in addition to

13  liquidated damages."  That's quoting Begum v. Areba

14  Disk, Inc., 2015 W.L. 223780 (S.D.N.Y. January 16th,

15  2015).

16            Judge Freeman went on to state, "Given that

17  FLSA liquidated damages serve a compensatory rather

18  than a punitive purpose, there's no need to employ pre-

19  judgment interest to restore plaintiffs to a position

20  they would have otherwise enjoyed absent the wage

21  protection violation."  Then she says, "In contrast,

22  under the New York Labor Law, a plaintiff may recover

23  both liquidated damages and pre-judgment interest."

24  That's under the New York Labor Law provisions, again

25  quoting from Furman at page 48 and the Begum case at

1     *3.

2         "Because New York State views liquidated

3 damages as punitive and not compensatory, pre-judgment

4 interest is not a duplicative damages award."  That's

5 from the Furman case at page 48, explaining that the

6 purpose of liquidated damages under the New York Labor

7 Law is to constitute a penalty on an employer's wilful

8 withholding of wages dues, while the purpose of pre-

9 judgment interest is to compensate a plaintiff for the

10 loss of use money.  "A plaintiff may recover both New

11 York Labor Law liquidated damages and pre-judgment

12 interest even where liability is found not only under

13 the New York Labor Law but also under the FLSA."

14 That's quoting the Begum case at *3.  Under the state

15 law, "Pre-judgment interest is calculated on the unpaid

16 wages due under the New York Labor Law, not on the

17 liquidated damages awarded under the state law."

18 That's a quote from the Mahena (ph) case, another

19 fairly well-known case at this point, 2013 W.L. 3023505

20 at *8, note 11.

21         As to the calculation of the interest, Judge

22 Freeman is quoting here from a case called Najden (ph),

23 2015 W.L. 6125436 at *4, where the court said,

24 "Pursuant to New York State law, a successful plaintiff

25 may receive pre-judgment interest at a rate of 9% per

1  year."  So now the question goes to, all right, what's

2  the date from which the interest should begin to run.

3  Judge Freeman is quoting from a case here where she

4  says, "As to the date from which interest should be

5  found to run, Section 5001(b) sets forth two methods of

6  calculating pre-judgment interest."  That's from

7  Alvarez v. 215 North Avenue Corporation, 2015 W.L.

8  3855285 at *3, adopting a report and recommendation.

9           Here's what that case says:  "First,

10  interest may be calculated from the earliest

11  ascertainable date the cause of action existed."

12  That's from the 5001(b) section of the CPLR.  "However,

13  where damages were incurred at various times, interest

14  shall be computed upon each item from the date it was

15  incurred or upon all of the damages from a single,

16  reasonable, intermediate date."  That's from the

17  Alvarez case at *3.  Finally, she says, "It's within

18  the court's wide discretion to determine a reasonable

19  date from which to award pre-judgment interest."

20           What the chart shows me, and I'm assuming

21  here it's what Mr. Williams' calculated -- he's taken

22  the approach which I agree with.  This is the approach

23  I would take, which is to determine a single,

24  reasonable, intermediate date.  He has listed here the

25  New York claims period starts obviously the first day

1   of Mr. Tartici's employment, which is November 10th of

2   2013, the end date being the last date of his

3   employment on July 11th, 2015.  Figuring out the

4   approximate midpoint here of September 10th, 2014 I find

5   to be a reasonable intermediate date, and I'm going to

6   adopt that date, okay?

7           MR. GREENBERG:  Thank you.

8           THE COURT:  What I'm not going to do,

9   however, is we're not going to calculate the interest

10  ourselves.  We usually have the clerk's office do that.

11          MR. GREENBERG:  Yes.

12          THE COURT:  Because they're much more in

13  tune with entering judgments and doing what has to be

14  done.  What I will do, however, is to direct them to

15  use the September 10th, 2014 date as a starting point

16  for running the pre-judgment interest, all right?

17          MR. GREENBERG:  Thank you.

18          THE COURT:  As to the liquidated damages,

19  that's the one thing here where there's no guess-work,

20  which is simply doubling the wages owed, so that number

21  will stay as is.  We are at a point where we can

22  reasonably calculate everything except a precise number

23  for the pre-judgment interest, which we'll, as I said,

24  take care of having the clerk's office handle if and

25  when we get to that point.

1          Those are my findings.  That's what I'm

2   leaving in the record because we're going to have to

3   come back to this at some point.  As I said, since Mr.

4   Tartici was here today, I didn't want to make him come

5   back a second time.  I'd rather get this on the record

6   with the assumption that there's going to be a refiling

7   with respect to the service issues here.

8          MR. GREENBERG:  Yes, thank you, your Honor.

9          THE COURT:  So what I'm going to do is put

10  in an abbreviated report and recommendation to Judge

11  Spatt, explaining that this hearing took place, I've

12  made a number of findings on the record.  However, we

13  have this issue that's arisen with respect to the

14  service, so for the moment, I'm going to recommend to

15  him that the motion itself be denied but without

16  prejudice and with the right to bring it back again

17  once those issues have been resolved, all right?

18         MR. GREENBERG:  Thank you again, your Honor.

19         THE COURT:  I think that's as far as we can

20  go for today's purposes, unless there's anything else

21  you want to address.

22         MR. GREENBERG:  No, thank you.

23         THE COURT:  Mr. Greenberg, I'll tell you

24  that like with every other plaintiff when I'm in a

25  default here, you're going to have to order the

1    transcript, all right?

2                MR. GREENBERG:  Yes.

3                THE COURT:  I'm not looking to have you get

4    an expedited one but if you want, I'll ask my courtroom

5    deputy Mary to come on out.  She will take care of the

6    information getting processed for you.

7                MR. GREENBERG:  Thank you.

8                THE COURT:  Mr. Tartici, good luck, okay?

9                MR. TARTICI:  Thank you, your Honor.

10                        *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18        I certify that the foregoing is a correct
19   transcript from the electronic sound recording of the
20   proceedings in the above-entitled matter.
21
22
23
24
25   ELIZABETH BARRON                    March 27, 2019
```